IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

IN RE: SUPERMARKET INVESTORS, INC., DEBTOR    CASE NO.: 4:09-bk-17497
CHAPTER 7

M. RANDY RICE                                                          PLAINTIFF

v.                                          AP NO.: 4:10-ap-01026

JOE SELZ
HAROLD "TINK" BENNETT AND BENNETT COMMERCIAL REFRIGERATION
DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Before the court is a *Complaint to Determine the Priority, Validity and Extent of Liens to Avoid Liens and to Determine Ownership Rights in Proceeds* ("Complaint") filed by the chapter 7 trustee, M. Randy Rice ("Rice"). The defendants, Joe Selz ("Selz") and Harold "Tink" Bennett and Bennett Commercial Refrigeration (collectively "Bennett"), filed counterclaims and cross-claims. The court held a trial on August 26, 2010. A post-trial briefing schedule concluded on September 17, 2010. Thereafter, the court took this matter under advisement.

For the reasons stated herein, the Complaint and counterclaims are granted in part and denied in part. Selz is entitled to an administrative claim in the amount of $20,070.66. Bennett is entitled to $19,515 in sales proceeds reduced by $7,250.68, which represents Bennett's pro rata share of the costs of sale.

### I.  Jurisdiction

The court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(K) and (O). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy

1

Procedure 7052.

## II. Facts

### A. Introduction

The issues in this matter are related to the bankruptcy filing of Affiliated Foods Southwest, Inc., Case No. 4:09-bk-13178, filed May 5, 2009 ("Affiliated Foods"). Four other entities related to Affiliated Foods also filed that same day.[1] Shur-Valu Stamps, Inc. ("ShurValu") is particularly pertinent to this proceeding and also filed on May 5, 2009.

Rather than proceed with a disclosure statement and plan of reorganization, both Affiliated Foods and ShurValu engaged in an orderly liquidation followed by conversion to chapter sevens on August 13, 2009. Rice became the chapter 7 trustee in the ShurValu matter.

ShurValu is the parent company of the debtor in this adversary proceeding, Supermarket Investors, Inc. ("SII"). SII did not file in May 2009. Rather, Rice, as the trustee in the ShurValu case, later chose to put the wholly owned subsidiary into a separate chapter 7 on October 13, 2009. The court thereafter appointed Rice as the trustee in the SII proceeding.

Rice filed a motion, first in the ShurValu case, and then in the subsequently commenced SII case, to sell personal property ("Personalty") located on the premises of a shopping center leased to SII from Selz. The sale of the Personalty forms the subject matter of the dispute between the parties to this adversary proceeding.

Although having some appreciable collective value, it is appropriate to describe the Personalty generally as the residue of a once thriving shopping center operation. The Personalty

---

[1] The court administratively, but not substantively, consolidated all five cases under the Affiliated Foods's case number.

2

consisted of compressors, shelving, display cases, and miscellaneous office and retail store equipment. Rice, as trustee, initially took the position that all of the Personalty constituted property of the estate that he could use or sell. Rice conducted an investigation and determined that two other parties, Selz and Bennett, might assert interests in the Personalty.

Bennett contends that he has an interest in the Personalty by virtue of a Bill of Sale from Bank of the Ozarks ("BOZ").[2] Rice agreed to part of Bennett's list, but each party reserved the right to contest ownership of the remaining items. Additionally, Rice and Bennett dispute their respective responsibility for costs related to the court-approved sale.

Selz, the landlord, does not assert a consensual lien on the Personalty and acknowledges that his statutory landlord's lien is avoidable by Rice pursuant to 11 U.S.C. § 545. Selz, however, insisted at trial that BOZ disclaimed any interest in the Personalty prior to selling it to Bennett. Selz further insisted that the Personalty–whether abandoned or owned by either BOZ or Bennett–is subject to an Arkansas statutory landlord's lien in favor of Selz. After trial, Selz and Bennett notified the court that they had resolved their differences. The issues remaining before the court are Selz's claim for administrative expenses, Bennett's pro rata obligation for sale costs, and the ownership of specific items of Personalty.

### B. The Lease

The Shopping Center Lease ("Lease") between Selz and SII is dated March 1, 1973, with a rental rate of $5,581.12 per month.[3] SII leased the premises for the purpose of operating a

---

[2] BOZ and SII entered into a lease/financing agreement that is not otherwise pertinent to this proceeding, but it afforded BOZ an ownership right in specific items of Personalty.

[3] The initial Lease was actually between a partnership and Safeway Stores, but it was subsequently assigned to these parties.

grocery store.  SII occupied the premises prior to the Affiliated Foods and related bankruptcies.

The source is unclear, but Affiliated Foods, ShurValu, or SII paid rent under the Lease through

the month of May 2009, the same month of the initial bankruptcy filings.  ShurValu filed a

chapter 11 bankruptcy on May 5, 2009, and it converted to a chapter 7 on August 13, 2009.  The

court subsequently appointed Rice as trustee.  Rice placed SII in a chapter 7 proceeding on

October 13, 2009, and he also serves as SII's trustee.  In the interim, the Lease expired by its

terms on either July 31, 2009 or August 31, 2009.  (Rice Ex. 1; Selz Ex. 4.)  Regardless, the

Lease expired before SII filed its chapter 7 bankruptcy.

The administratively consolidated bankruptcies under the Affiliated Foods umbrella,

coupled with liquidation versus reorganization and the subsequent conversions to chapter sevens,

resulted in some ambiguity as to which entity controlled various assets in the rapidly

deteriorating grocery operations.  This ambiguity manifested itself in the dispute between the

parties to this adversary proceeding.

A July 31, 2009 demand letter from Selz to BOZ, SII, U.S. Bank, N.A., and counsel for

Affiliated Foods attempted to address this ambiguity.  The demand letter reflected uncertainty as

to which entity or entities might claim an interest in the Personalty left on the premises.  The

letter stated that Selz had secured the premises at the request of Little Rock Police Department

because the police department needed access to a tracking device installed on the roof.

Additionally, Selz demanded that any personal property be removed from the premises and

reserved his right to assert all claims against SII's property as allowed by law.

Lacking a satisfactory response, Selz filed a motion in the Affiliated Foods bankruptcy

on August 28, 2009, prophylactically seeking to clarify the priority of his landlord's claim for

4

unclaimed rent and seeking to dispose of any personal property located on the leased premises. In his motion, Selz recognized that SII was not a debtor in bankruptcy but that one or more of the debtor estates might claim an ownership interest in some of the allegedly abandoned personalty. (Mot. for Determin. of Secured Status, 2, Aug. 28, 2009, ECF No. 883.)  Selz went on to recite in the motion that "lien searches and lien filings indicate that [BOZ] may also claim a secured interest in the [Personalty]."  *Id*.

On September 15, 2009, Rice filed a motion ("First Motion") on behalf of ShurValu in the consolidated Affiliated Foods bankruptcy.  In his First Motion, Rice recited that ShurValu was the sole shareholder of SII and that ShurValu, accordingly, may claim an ownership interest in some of the personal property located on the leased premises.  Further, Rice acknowledged that the landlord, presumably Selz, had requested relief from the stay to sell or otherwise dispose of the assets on the premises.  Alleging that the assets had substantial value, Rice asked for a preemptive court order allowing him, as trustee, to sell all the personal property free and clear of liens, with the liens to attach to the proceeds.

Complicating matters even further and in consideration of $5,000, BOZ conveyed to Bennett "all of its right, title and interest in and to certain equipment now located or previously located at [another grocery store location] and [the SII leased premises]" through a Bill of Sale dated September 15, 2009 (the same day as the First Motion).  (Bill of Sale, Apr. 29, 2010, 1, ECF No. 11-1.)  The Bill of Sale continued, "[Bennett] acknowledges there may be other equipment at the above described locations that are not being sold or transferred to [Bennett] and that other parties may be claiming an interest in [the assets sold]."  *Id*.  Attached to the Bill of Sale was a Schedule of Leased Equipment ("Equipment List").

BOZ responded in a rather equivocal fashion to Selz's letter concerning the Personalty. (Selz Ex. 5.)  On September 17, 2009, Rice in turn filed a response to Selz's motion asserting that his understanding was that Mechanical Refrigeration and Conditioning, Inc. had purchased the personal property on the premises but that there might be other perfected and unperfected liens and that the "trustee is not absolutely certain what parties may claim liens against this personal property."  (Trustee's Resp. to Mot. for Determin. of Secured Status, 1, Sept. 17, 2009, ECF No. 952.)  Rice reiterated his desire to sell all of the personal property on the premises, with liens to attach to the proceeds.

By early October 2009, Rice had determined that SII needed its own chapter 7 bankruptcy; accordingly, he filed a petition on October 13, 2009.  Two days later, the court appointed Rice as the trustee in the SII case.  One day after the SII filing, on October 14, 2009, Rice appeared as the trustee in the ShurValu bankruptcy and requested that the court allow him to withdraw the First Motion.  Rice's request resulted in this court's *Order Withdrawing Motion to Sell Personal Property Free and Clear of Liens*, entered on October 16, 2009.  (Order Withdraw. Mot. To Sell Pers. Prop., 1, Oct. 16, 2009, ECF No. 1068.)

Shortly thereafter, on October 23, 2009, Rice filed a second motion ("Second Motion") to sell the Personalty free and clear of liens in the SII bankruptcy.  Rice, as trustee, asserted that SII had an ownership interest in all of the personal property located on the leased premises and asked to sell the same, with liens to attach to the proceeds in their order of priority.  Both Bennett and Selz filed objections.

### C.  The Sale Order

On December 9, 2009, the court entered an agreed *Order Regarding the Listed*

*Objections to the Trustee's Motion to Sell Personal Property* ("Sale Order"), granting the relief requested in the Second Motion.  Bennett and Selz resolved their objections to the sale with Rice.  (Sale Order, 1, Dec. 9, 2009, ECF No. 92.)  The parties agreed to allow the sale but reserved for trial any issues concerning the ownership of disputed items between Rice and Bennett, lien rights, the allocation of sales costs between Rice and Bennett, and the administrative expenses to Selz.

The December 17, 2009 sale generated proceeds in the amount of $118,193.90.  The auctioneer testified that the sale benefitted from occurring at the facility, by having the utilities on, and by avoiding the expense of removing the items to a third location for storage and preparation prior to the auction.  If sold elsewhere, the sale might have generated substantially less–perhaps as much as fifty percent–than the eventual sales proceeds.

### i. Disputed Items

Contrasting the Bill of Sale and the actual items on the premises resulted in some disagreement as to which assets BOZ had actually transferred to Bennett.[4]  The parties agreed to a methodology by which their agents would determine which items were transferred and which were subject to dispute.  This effort resulted in an agreed list totaling $18,290 in value to Bennett and confining the dispute to the following items:

| Lot Number | Description | Price |
| --- | --- | --- |
| 35 | Product Rack | 105 |
| 36 and 36(a) | Product Rack | 0 |
| 37(a) | SS Hand Sink | 150 |
| 65 | Credit Card Machines | |

---

[4] The Equipment List attached to the BOZ lease and the Bill of Sale (Rice Ex. 3) is the reference point for the quitclaim character of the Bill of Sale.

7

|     |                          |      |
| --- | ------------------------ | ---- |
|     | and Electronics          | 175  |
| 87  | Black 4x6 End Cap         | 1200 |
| 200 | Refrigerator Compressor   | 100  |
| 201 | 2x5 SS Table              | 90   |
| 212 | Complete Surveillance System with all Cameras | 900 |
| 250 | Hobart Wrapping Unit      | 1400 |
| 251 | Meat Tray                 | 75   |

The disputed items generated sales proceeds of $4,195.  At trial, Bennett disclaimed any interest in all but four of the above items–Lot Numbers 37(a), 65, 200, and 212.  The evidence reflects that the BOZ Bill of Sale (Selz Ex. 3) included items 37(a), 65, and 212.

Specifically, item 37(a), the SS Hand Sink, is described on the Bill of Sale as the "Sink–Single Compartment Stainless" and is conveyed by the Bill of Sale.  Item 65, the credit card machine and electronics, is described on the Bill of Sale as "Credit Card Equipment" and is conveyed by the Bill of Sale.

The "Security System–Quad–Ultra KQ8300MN" reference on the Bill of Sale equals the surveillance system plus cameras on the leased premises.  The abbreviated security system reference should be read in context with the Equipment List references to VCRs and other isolated items which, taken as a whole, comprised the security system and is conveyed by the Bill of Sale.

The Bill of Sale does not convey item 200.  The generic reference to a refrigerator compressor on the premises is not redundant and appears to be in addition to the 21 compressors noted on the Equipment List.  Accordingly, the stand-alone refrigerator compressor valued at $100 is not conveyed by the Bill of Sale.

Bennett is entitled to an additional $1,225 plus the agreed amount of $18,290, for a total

8

of $19,515.

### ii. Costs of Sale

The Sale Order provides in pertinent part:

[Bennett has] consented to allow the [Personalty he] claim[s] an interest in to be sold by [Rice] at auction, and [Bennett] shall bear [his] pro-rata share of the costs of sale and [Rice's] fee based upon [his] share of the sales proceeds[.]

(Sale Order, 1-2, Dec. 9, 2009, ECF No. 92.)

The sale generated gross proceeds of $118,193.90.  From this figure, Rice deducted $9,159.20 for his statutory trustee's fee, $816.68 for the trustee's sale expenses (not including Selz's administrative claim), a $10,745 auctioneer's commission, and $3,152 for the auctioneer's expenses, for a total of $23,872.88 in expenses.  This calculation nets $94,321.02 for the estate. From this $94,321.02 net to the estate, Rice then assumed a total administrative claim to Selz of $19,043.61.  Subtracting this amount results in net proceeds of $75,277.41 after payment of administrative claims.

Rice suggested two alternative methods to arrive at Bennett's pro rata share of the costs of sale based on Bennett's share of the sales proceeds.  The first alternative assumes undisputed proceeds of the sale to Bennett in the amount of $18,290.  Rice reduces this distribution to $11,645.41 by multiplying 15.47%[5] times $75,277.41, the net sale proceeds after the deductions listed above, including Rice's trustee fee.[6]  This method simply assesses all costs and administrative costs, with the exception of Rice's fees and costs, to Bennett pro rata based upon

---

[5] Rice arrived at this percentage by dividing $18,290 by $118,193.90 to establish Bennett's percentage of the total sales proceeds.

[6] Rice's Exhibit 2 reflects $18,290 as a multiplier, which does not equal $11,645.41, but the $75,277.41 figure does result in the $11,645.41 amount.

his distribution.

Rice's second scenario achieves a similar distribution to Bennett of $11,648.91. Here, Rice adds the suggested administrative costs of $23,872.88 to the proposed Selz distribution of $19,043.61 (an amount disputed by Selz and discussed below) in administrative costs for a combined $42,916.49 in administrative costs. Rice then divides $42,916.49 by the gross sale receipts of $118,193.90 to arrive at a percentage share of administrative costs assigned to Bennett of 36.31%. Rice then multiplies 36.31% by $18,290 (Rice's proposed gross distribution to Bennett, an amount Bennett disputes), resulting in $6,641.09, which Rice subtracts from $18,290, resulting in a distribution to Bennett of $11,648.91. Because the two scenarios have almost the same result, Rice sets Bennett's distribution at $11,650.

### D. Selz's Administrative Claim

The Sale Order preserved Selz's right to pursue an administrative claim. To the extent the Sale Order reserved Selz's right to pursue Bennett for any costs of sale or a lien on the Personalty, the parties resolved that issue after trial. The court is not aware of the specifics of their resolution.

At trial, the parties presented evidence concerning their respective administrative claims. The evidence focused on certain agreed upon dates. The parties agree that SII's rent was current through May 2009. The Lease expired by its terms on July 31, 2009, or it expired no later than August 31, 2009. SII filed its petition on October 13, 2009. The sale of the Personalty occurred on December 17, 2009. The premises were cleared by or shortly after the New Year.

Rice proposes to pay Selz the following administrative expenses:

> -$14,402.89 representing the lease rental of $5,581.12 per month from
> October 13, 2009 through December 31, 2009 (79 days).

10

-$1,279.44 for real estate taxes for 2009 prorated over 79 days, i.e., $5,911.32 divided by 365 days equals a daily rate of $16.20.

-$1,422.79 for common area maintenance prorated over 79 days. Selz agrees with this calculation.

-$850 for cleaning expenses to Bates, an individual Rice hired. Selz concurs with this expense.

-$73.38 for water bills through December 31, 2009.

-$1,015.11 for electric bills through December 31, 2009.

The total administrative expenses to Selz equal $19,043.61.

Conversely, Selz seeks $65,384.47 in administrative expenses consisting of the following:

-$45,549.16 for lease payments from May 31, 2009 to January 5, 2010 at $5,581.12 per month. Selz contends the lease terminated by its terms and, thereafter, SII simply held over.

-$828.66 for common area maintenance charges for July and August 2009. Selz contends the lease terminated by it terms on August 31, 2009. (Selz Ex. 4.)

-$3,448.27 for real estate taxes for 7 months in 2009, representing 7/12ths of $5,911.32.

-$470.86 for a locksmith as SII did not turn over the keys. Generally, a chapter 7 trustee will secure property after his appointment. In this instance, Selz changed the locks in July 2009, before the SII bankruptcy, because the premises had been vacated and the local police needed access to reach tracking equipment installed on the roof.

-$250 for picking up trash at the rear of the store. This amount was paid on September 8, 2009.

-$3,900 for cleaning mud-stopped drains on the flooded loading dock. Selz contracted and paid for this effort on September 19, 2009. Selz contends that the drainage problems flooded the loading dock and that clearing the drains was necessary for off-loading items purchased at the sale. Rice did not view any loading from the dock. Rice's auctioneer

11

testified that the drain work had already been done before he inspected the premises, before the October bankruptcy filing, and before the December 17 sale, but he acknowledged that some buyers would certainly need access to the dock.

-$209.63 for rat control, which Selz characterizes as "for auction." (Selz Ex. 1.) Rice did not ask for this service. The rat abatement occurred on October 12 or 14, 2009, and was necessitated by rats invading other tenants' spaces.

-$850 to Leonard Bates for cleaning out rotten inventory. This invoice was paid on October 9, 2009, before SII filed its petition on October 13, 2009. Both Rice and Selz, however, conceded that this effort was necessary and that it should be an expense of the sale. (Rice's testimony; accounting outlined above; Selz Ex. 2.)

-$62.71 for Entergy bill paid on November 14, 2009.

-$21.06 for Entergy bill paid on November 23, 2009.

-$36.69 for water bill paid on October 29, 2009.

-$36.69 for water bill paid on November 29, 2009.

-$326.13 for Entergy bill paid on December 2, 2009.

-$1,015.11 for Entergy bill for December 2009.

-$14.71 for CenterPoint bill paid on December 23, 2009. The evidence sufficiently demonstrates that heating the premises was important in the winter both with regard to insuring the property and preventing the sprinkler system from freezing.

-$1,889.79 for CenterPoint bill for December 14, 2009 to January 15, 2010.

-$3,000 to clean after the auction. On January 4, 2010, Selz contracted with James Nunley Enterprises to "sweep and clean store" and to secure the trash bins necessary to do so.

-$1,350 for three "roll off" charges of $450 each on January 4, 2010. These charges relate to dumpsters used in conjunction with cleaning up after the sale (the $3,000 charge above to James Nunley Enterprises). Neither Rice nor the auctioneer ever told Selz that the trustee would not be

responsible for post-sale cleaning.  Equally, the parties never reached a clear understanding or agreement in this regard.

-$2,125 based on a January 12, 2010 estimate to seal holes in the roof caused by equipment removal.  The parties did not reach any agreement in this regard.  The auctioneer announced prior to the auction that the buyers were responsible for any damages.

### III.  Analysis

The representations and concessions made at trial, coupled with the post-trial resolution of some of the reserved issues, result in the following remaining disputes:

A) <u>Disputed Items</u>.  All three parties agreed to the sale with their respective liens or interests to attach to the proceeds.  The Bill of Sale from BOZ to Bennett includes an agreed portion of the Personalty, with the exception of four disputed items.

B) <u>Selz's Administrative Claim</u>.  Selz asserts a $65,384.47 administrative claim.  Rice concedes a claim of $19,043.61.

C) <u>Bennett's Obligation for Sale Costs</u>.  Bennett consented to Rice selling the Personalty at auction, with Bennett to bear his "pro-rata share of the costs of sale and [Rice's] fee based upon [Bennett's] share of the sales proceeds[.]"  (Sale Order, 1-2, Dec. 9, 2009, ECF No. 92.)

### A. Disputed Items

At trial, Bennett conceded that certain items should not be included in his allocation of the proceeds.  Of the four remaining disputed items, the evidence clearly demonstrates that Bennett is entitled to the sales proceeds from items 37(a), 65, and 212, but not 200.  Accordingly, Bennett is entitled to an additional $1,225 plus the agreed amount of $18,290, for a total of $19,515.

### B. Selz's Administrative Claim

Administrative expense claims generally arise in a "Chapter 11 or Chapter 7 case when the debtor-in-possession or the trustee enters into a post-petition arrangement for goods and

13

services necessary to the preservation of the estate." *In re Woods Farmers Cooper. Elevator Co.*, 107 B.R. 694, 696 (Bankr. D. N.D. 1989) (explaining that the storage of grain, which was the only real remaining asset of a defunct grain warehouse, fell within the concept of preserving the estate). In a chapter 7 case, the costs incidental to the disposition of assets may also constitute administrative expenses. *Id*. With regard to administrative expenses, section 503(b)(1)(A) of the Bankruptcy Code provides in relevant part:

> (b) After notice and a hearing, there shall be allowed administrative expenses . . . including –
> > (1)(A) the actual, necessary costs and expenses of preserving the estate[.]

11 U.S.C. § 503(b)(1)(A) (2010).

When determining whether a postpetition debt qualifies as a "necessary preservation expense," most courts require the satisfaction of a two-part test: "(1) it must have arisen from a transaction with the estate and (2) it must have benefitted the estate in some demonstrable way." *In re White Rock, Inc.*, No. 01-44553M, 2002 WL 32114479, at *2 (Bankr. E.D. Ark. 2002). Moreover, to establish administrative priority, a "concrete benefit" must be conferred upon the estate; a merely incidental or tenuous benefit will not suffice. *In re Cheatle*, 150 B.R. 266, 269 (Bankr. D. Color. 1993). The burden rests upon the administrative claimant to establish that both prongs of the statute have been met. *In re White Rock, Inc.*, No. 01-44553M, 2002 WL 32114479, at *2 (Bankr. E.D. Ark. 2002).

The use of the word "including" in § 503(b) is also significant. *In re Pappas*, 277 B.R. 171, 176 (E.D. N.Y. 2002). Subsection (b)(1)(A) provides just a few examples of the administrative expenses allowed under section 503(b). *Id*. "The categories of administrative expenses listed in [s]ection 503(b) are intended to be illustrative, not exhaustive." *Id*.; *see also*

14

11 U.S.C. § 102(3) (2010) (stating that the terms "includes" and "including" are not limiting). Because the statute's language was not intended to be limiting, courts have concluded that "[e]xpenses not explicitly listed in the statute can receive administrative expense status in one of two ways:  as a nonlisted 'actual, necessary' expense of preserving the estate under section 503(b)(1)(A) or as a nonlisted administrative expense under section 503(b)."  *In re Pappas*, 277 B.R. at 176 (quoting *Younger v. U.S.* (*In re Younger*), 165 B.R. 965, 968 (S.D. Ga. 1994)).

"[C]ourts have recognized that, in the interest of fairness, some costs ordinarily incident to the operation of the business should be allowed as administrative expense[s], even if not directly beneficial to the estate."  *In re White Rock, Inc.*, No. 01-44553M, 2002 WL 32114479, at *2 (Bankr. E.D. Ark. 2002).  Such decisions followed the United States Supreme Court's decision in *Reading Company v. Brown*.  *See generally* 391 U.S. 471 (1968).  In *Reading*, the Court "addressed the allowability of an administrative claim that did not 'benefit' the estate in the typical sense . . . ."  *White Rock*, at *2; *see also Reading*, 391 U.S. at 476.  The Court ultimately allowed the claim, reasoning that "considerations of fundamental fairness and logic required the allowance of a claim" that arises from the negligence of a receiver in a chapter 11 case.  *Id.*; *Reading*, 391 U.S. at 485; *see also In re Zedda*, 169 B.R. 605 (E.D. La. 1994) (discussing the allowance of claims, despite the creditor's failure to mold those claims perfectly within 503's ambit).  In *Zedda*, the trustee said that "but for" the creditor's work, "a judgment in favor of the estate . . . would not have been entered."  169 B.R. at 607.  Both *Reading* and *Zedda* evidence the array of factors that a court can consider when evaluating administrative expense claims.  In sum, section 503(b) affords the bankruptcy court "broad discretion in determining whether a claim is an administrative expense."  *In re White Rock, Inc.*, No. 01-44553M, 2002

WL 32114479, at *2 (Bankr. E.D. Ark. 2002).

Despite the statute's non-limiting language and the court's latitude, section 503(b) is not limitless and "should be narrowly construed to maximize the value of the estate for the benefit of all creditors." *In re White Rock, Inc.*, No. 01-44553M, 2002 WL 32114479, at *2 (Bankr. E.D. Ark. 2002) (quoting *Varsity carpet Serv., Inc. V. Richardson*, (*In re Celotex Indust. Inc.*), 19 F.3d 1371, 1377 (11th Cir. 1994)). "This premise preserves the presumption that the debtor has limited resources to be equally distributed among his creditors . . . ." *In re Cheatle*, 150 B.R. 266, 270 (D. Colo. 1993). Therefore, "only those creditors that perform services that are actual and necessary to preserve the bankrupt estate . . . should be given . . . administrative priority." *Id*. Thus, this court's analysis necessarily "focuses on the actual benefit conferred upon the estate, not the loss sustained by . . . creditors." *Id*.

Finally, the court must consider "whether the creditor provided the services out of self-interest." *In re Cheatle*, 150 B.R. 266, 269 (D. Colo. 1993). "If the creditor incurred expenses while acting substantially in its own interest, it [is] not entitled to a priority administrative expense claim." *Id*.

Given the standards enumerated above, a line item analysis is appropriate to aid in the determination of which expenses should be granted administrative priority. The items that Rice concedes include:

> -<u>Rent</u>. Rice concedes $14,402.89, representing the lease rate of $5,581.12 per month from October 13, 2009 through December 31, 2009 (79 days). Selz seeks an administrative expense of $45,549.16 for lease payments from May 31, 2009 through January 5, 2010. Rice's calculation is more appropriate. Absent assumption under § 365, the trustee is not responsible for prepetition holdover amounts or, absent an express postpetition agreement, damages for cure. The use of the premises postpetition clearly benefitted the estate in the context of storage and at the on-premises sale.

Thus, Selz is entitled to $14,402.89.

-Taxes.  Rice concedes $1,279.44 for real estate taxes for 2009 prorated over 79 days, i.e., $5,911.32 divided by 365 days, for a daily rate of $16.20.  Selz seeks an additional $3,448.27 for seven months in 2009.  The amount suggested by Rice is appropriate on the same logic and basis as the rent discussion above.  Selz is therefore entitled to $1,279.44.

-Common area maintenance.  Rice concedes $1,422.79 for common area maintenance prorated over 79 days.  Selz agrees with this base calculation but seeks an additional $828.66 for common area maintenance charges for July and August 2009.  The figure used by Rice is appropriate on the same logic and basis as the rent outlined above.

-Water.  Rice proposes to treat as an administrative expense $73.38 for water bills incurred through December 31, 2009.  Selz seeks an additional $36.69 respectively for October and November, 2009.  Selz is entitled to an aggregate of $110.07, representing three minimum water bills of $36.69 for October, November, and December 2009.  Certainly, the premises required water for fire protection, cleaning, and waste disposal.

-Electric bills.  Rice concedes $1,015.11 for electric bills through December 31, 2009.  Selz conversely asserts that he is entitled to $1,425.01.  The latter amount is appropriate and appears inclusive of the postpetition period when Rice had the Personalty on the premises.

Rice does not concede any further administrative expenses.  Selz seeks as additional administrative expenses the items outlined below.  At this juncture, two salient facts impact the court's analysis concerning the appropriateness of awarding administrative priority to the claimed amounts.

First, the lease terminated prior to the bankruptcy, and Selz moved to secure the premises for his own benefit.  It does not appear that any party intended or now contends that the lease was assumable or that the leased premises constituted property of the estate.  Instead, Selz's focus was on the real property.  Rice's focus, as trustee, was on the personal property located on the premises.  Rice had an interest in the personal property completely independent of Selz's

interest in the improved real property. At times, those interests converged. This was the case when Rice utilized the premises for the collection, storage, protection, and sale of the Personalty, and Selz asserted a lien on the Personalty, hoping to realize an economic benefit from its ultimate sale. Accordingly, some of Selz's expenses were occasioned by and directly related to his interest in preserving the improved real property and, coincidentally, his interest in maximizing the sales proceeds of the Personalty which, by virtue of the position taken in his pleadings and correspondence, might inure to his benefit.

Second, the parties never articulated or entered into an agreement specifically outlining the use of the premises during the storage, sale, and aftermath. Again, it appears that both parties had a mutual self-interest in maximizing the sales proceeds and acted more consistent with that interest, simply preserving their right to contest the administrative expense issue. These two factors must be taken into consideration when analyzing Selz's claim for additional administrative expenses.

> -Locksmith. Selz asks for $470.86 for a locksmith because SII did not turn over the keys when it vacated the premises. Generally, a chapter 7 trustee will secure property after his appointment. In this instance, Selz changed the locks in July 2009–well before the SII bankruptcy–because the premises had been vacated and the local police needed access to tracking equipment installed on the roof. Common sense dictates that, although this expense is both prepetition and in Selz's best interest, coextensively, it represents an amount the trustee would have incurred in securing the premises. Rice should not be a gratuitous beneficiary of an expense that clearly benefitted the estate and was integral to securing and storing the Personalty. Accordingly, this amount is compensable as an administrative claim.

> -Trash. Selz asks for $250 for removing trash at the rear of the store. This amount was paid on September 8, 2009–well before the bankruptcy proceeding. This expense may represent a claim under the terms of the breached lease, but it is not an administrative claim.

-<u>Drainage</u>.  Selz seeks $3,900 for cleaning out mud-stopped drains on the flooded loading dock.  Selz contracted and paid for this effort on September 19, 2009, well before SII filed its chapter 7.  Selz contends that clearing the drains was necessary for off-loading items purchased at the sale.  Rice did not view any loading from the dock.  Rice's auctioneer testified that the drain work had already been done before he inspected the premises, before the October bankruptcy filing, and before the December 17 sale, but he acknowledged that some buyers would certainly need access to the dock.  This amount is not compensable as an administrative claim. While the work may have peripherally provided some benefit to the estate, the principal impetus for this repair was not only prepetition, but it also directly–and over the long term–benefitted Selz in the context of rehabilitating and marketing the premises.  Thus, Selz, rather than the estate, was the real beneficiary of this effort.

-<u>Pest Control</u>.  Selz seeks $209.63 for rat control, which Selz characterized as "for auction." (Selz Ex. 1.)  Rice did not ask for this service.  The rat abatement occurred around October 12 or 14, 2009 and was necessitated by rats invading other tenants' spaces.  For the same reasons as stated with respect to the drainage issue, this amount is not a proper administrative expense.

-<u>Heating Bills</u>.  Selz seeks $1,889.79 for a CenterPoint bill for December 14, 2009 to January 15, 2010 and $14.71 for a CenterPoint bill paid December 23, 2009.  Heating the premises was important in winter both with regard to insuring the premises and preventing the sprinkler system from freezing.  Clearly, the trustee enjoyed these benefits both in the storage and sale contexts.  Selz is entitled to an administrative claim for the $14.71 bill and one half of the $1,889.79 bill representing December (but not January), for a total of $959.60.

-<u>Cleaning</u>.  Selz seeks $3,000 for labor to clean after the auction.  On January 4, 2010, Selz contracted with James Nunley Enterprises to "sweep and clean store" and to secure the necessary trash bins.  Associated with this effort, Selz incurred $1,350 in costs for three "roll off" charges of $450 each.  These charges relate to the dumpsters used in conjunction with cleaning up after the sale.  Selz also asserts a $2,125 claim based on a January 12, 2010 estimate to seal holes in the roof caused by equipment removal.  The auctioneer announced prior to the auction that the buyers were responsible for any damages.  Rice did not tell Selz that the trustee would not be responsible for post-sale cleaning.  Equally, the parties never reached a clear understanding or agreement in this regard.  These are not proper administrative expenses because cleaning after the sale did not benefit the estate.  Instead, cleaning expenses should have been negotiated

in the context of granting Rice the right to store and sell the Personalty on the premises. Again, it appears that both Rice and Selz were acting in their own self-interests, including Selz's interest in maximizing the sales proceeds, which he felt might inure to his benefit. No clear agreement was reached prior to the sale, and the failure to do so is fatal to Selz's administrative claim. This claim, therefore, cannot be characterized as anything other than a general claim for breach of contract damages, and it is not otherwise entitled to administrative priority.

Accordingly, Selz is entitled to an administrative claim in the amount of $20,070.66. This amount is not a charge against the sales proceeds but instead represents the proper amount of Selz's administrative claim to be paid according to its priority from proceeds of the estate to the extent that they are available. The balance of the damages or claimed amounts may be asserted in a proof of claim as a general unsecured claim without administrative priority.

### C. Bennett's Obligation for Sale Costs

The parties agreed to the sale and presented an agreed order to the court. After the sale, Rice and Bennett could not agree on Bennett's share of the sale's costs.

The sale generated gross proceeds of $118,193.90. From this figure, Rice deducted $9,159.20 for his statutory trustee's fee, $816.68 for the trustee's sale expenses (not including Selz's administrative claim), a $10,745 auctioneer's commission, and $3,152 for the auctioneer's expenses, for a total of $23,872.88 in expenses. This calculation nets $94,321.02 for the estate. From this $94,321.02 net to the estate, Rice assumed a total administrative claim to Selz of $19,043.61 (discussed and altered above). Subtracting this amount resulted in net proceeds of $75,277.41 after payment of administrative claims.

Rice suggested two alternative methods to arrive at Bennett's pro rata share of the costs of sale based upon Bennett's share of the sales proceeds. The first alternative assumes undisputed proceeds of the sale to Bennett in the amount of $18,290 (discussed and altered

above).  Rice reduces this distribution to $11,645.41 by multiplying 15.47%[7] by $75,277.41, the

net proceeds of the sale after the deductions listed above, which includes Rice's trustee fee.[8]

This method simply assesses costs and administrative costs to Bennett based upon his pro rata

distribution.

   Rice's second scenario achieves a similar distribution to Bennett of $11,648.91.  Here,

Rice adds the administrative costs of $23,872.88 to the proposed Selz distribution of $19,043.61

(an amount disputed by Selz and discussed above) in administrative costs for a combined

$42,916.49 in administrative costs.  Rice then divides $42,916.49 by the gross sale receipts of

$118,193.90 to arrive at a percentage share of administrative expenses assigned to Bennett of

36.31%.  Rice then multiplies 36.31% by $18,290 (Rice's proposed gross distribution to Bennett,

an amount Bennett disputes), resulting in $6,641.09, which Rice subtracts from $18,290,

resulting in a distribution to Bennett of $11,648.91.  Because the two scenarios have almost the

same result, Rice sets Bennett's distribution at $11,650.

   In effect, the parties are asking the court to interpret the contractual provisions of the Sale

Order concerning the distribution of proceeds.  Applying accepted principles of contract

interpretation, the literal wording of the Sale Order, and the math as altered by this opinion, the

court concludes that Bennett is obligated for $7,250.68 in pro rata sales costs.

   It is axiomatic that courts should look to the written agreement itself to determine the

intention of the contracting parties.  *First Nat'l Bank of Crossett v. Griffin*, 832 S.W.2d 816,

---

   [7] Rice arrived at this percentage by dividing $18,290 by $118,193.90 to establish
Bennett's percentage of the total sales proceeds.

   [8] Rice's Exhibit 2 reflects $18,290 as a multiplier, which does not equal $11,645.41, but
the $75,277.41 figure does result in the $11,645.41 amount.

21

819 (Ark. 1992).  Arkansas courts have held that the first rule of contract interpretation is to give "the language employed the meaning which the parties intended."  *Id.* (citation omitted).  Next, courts "must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain, ordinary meaning."  *Id.* (citation omitted).  Finally, courts recognize that a proper interpretive inquiry requires that the contract be read in whole; "giving effect to one clause to the exclusion of another . . . where the two are reconcilable, is error."  *Id.* (citation omitted).

As discussed, when the parties to a contract express their agreement in clear, unambiguous language, the contract must be construed according the usual meaning of the language employed.  *Coble v. Sexton*, 27 S.W.3d 759, 762 (Ark. 2002).  However, where the language used by the parties is ambiguous, the parol evidence rule is admissible to aid the court in explaining the intention of the parties.  *Id.*

Here, the parties offered no parole evidence.  No one testified as to their intentions or understandings of the language agreed to in the Sale Order.  This, however, is not fatal.  The Sale Order is clear and unequivocal, and the appropriate formula is contained therein.

The Sale Order provides in pertinent part:

[Bennett has] consented to allow the [Personalty] they claim an interest in to be sold by [Rice] at auction, and [Bennett] shall bear [his] pro-rata share of the costs of sale and [Rice's] fee based upon [his] share of the sales proceeds[.]

(Sale Order, 1-2, Dec. 9, 2009, ECF No. 92.)

The plain reading of the Sale Order requires the court to first determine Bennett's "share of the sales proceeds," then assign a percentage to that share, and finally, multiply that percentage by the "costs of sale and [Rice's] fee[.]" *Id.*  That formula is fairly simple.  The sale

22

generated proceeds in the amount of $118,193.90. Bennett's share is $19,515. Dividing the latter by the former results in Bennett receiving 16.5% of the total sales proceeds.

The "costs of sale and [Rice's] fee" is equally clear. Rice's statutory trustee's fee was $9,159.20, and his expenses were $816.68. The auctioneer's commission was $10,745 plus expenses of $3,152. Additionally, it is appropriate to include in this calculation of the costs of sale the entirety of the administrative expenses to Selz of $20,070.66. This is appropriate because neither Bennett nor Rice had any interest in the real property other than the Personalty assembled, stored, prepared for sale, and sold on the premises. Likewise, all of the administrative costs awarded Selz herein are strictly attributable to the actual and necessary expenses of preserving the Personalty–the only assets of the estate at issue in this proceeding. The costs of sale total $43,943.54. Multiplying $43,943.54 by 16.5% results in Bennett being responsible for $7,250.68 in administrative costs. The precise wording of the Sale Order, coupled with general principles of contract interpretation, compel this result.

## IV.  Conclusion

For the reasons stated herein, the Complaint and counterclaims are granted in part and denied in part. Selz is entitled to an administrative claim in the amount of $20,070.66. This amount is not a charge against the specific sales proceeds but instead represents an administrative priority claim, payable according to its priority and to the extent that funds from the estate are available. The balance of Selz's claim may represent a general unsecured claim for which Selz is entitled to file an appropriate proof of claim. Bennett is entitled to $19,515 in sales proceeds, reduced by $7,250.68 (representing Bennett's pro rata share of the costs of sale), for a total distribution of $12,264.32. This amount is a charge upon the specific sales proceeds. The

parties are to bear their own costs and fees.

IT IS SO ORDERED.

Dated this <u>14th</u> day of December, 2010.

_____
RICHARD D. TAYLOR
U.S. BANKRUPTCY JUDGE


cc:   M. Randy Rice, Chapter 7 Trustee
      William David Duke, Attorney for Joe Selz
      Jason N. Bramlett, Attorney for Harold "Tink" Bennett and Bennett Commercial
      Refrigeration
      Stephen B. Niswanger, Attorney for the Chapter 7 Trustee

24